**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

15-cv-09890 (AJN)(SN)

------------------------------------------------------------------------------

TRACEY TOOKER, and TT LTD., INC.

                                Plaintiffs,

        -against-

**AMENDED**

**COMPLAINT**

BARBARA WHITWORTH, d/b/a WHITWORTH HATS,

d/b/a WHITWORTH DESIGNS, and CHANDRA

RANSAMIE

                             Defendants.

------------------------------------------------------------------------------

This Amended Complaint is being made under Rule 15(a)(2) of the Federal Rules of Civil Procedure, which allows a party to amend its pleading with the opposing party's consent or with the court's leave.

Plaintiffs are amending their Complaint in response to defendant's removal of this action to the U.S. District Court. Defendants' basis for removal is that the original Complaint contained federal law claims over which the U.S. District Court has original and exclusive jurisdiction. Plaintiffs accordingly hereby amend their Complaint to clearly delineate and describe those federal causes of action. In addition, plaintiffs add a new cause of action under Florida state law, and clarify the legal basis for their New York state law claims.

The Plaintiffs by and through their attorney, and for an Amended Complaint against the Defendants, respectfully state and allege as follows:

I.    JURISDICTION AND VENUE

1.   This civil action arises under the laws of the United States.  Under 28 U.S.C. §1331, the district courts shall have original jurisdiction of all civil actions arising from the Constitution, laws or treaties of the United States.  Under 28 U.S.C. §1338(a), the district courts shall have original jurisdiction over civil actions arising under Acts of Congress relating to patents, copyrights, trademarks, and, under 28 U.S.C. §1338(b), over unfair competition claims when joined with claims relating to patents, copyrights and trademarks.  The same rules extend to original designs, by virtue of 28 U.S.C. §1338(c).

2.   Under 17 U.S.C. §301, this Court has jurisdiction over claims of infringement of unregistered original designs[1] made herein under Chapter 13 of the Copyright Act, and over the trade dress infringement claim made herein under the Lanham Act, 15 U.S.C. §1125.

3.   Pursuant to 28 U.S.C. §1367,[2] the Court may, at its discretion, assert supplemental jurisdiction over the New York state law and common law contract and tort claims, including

---

[1] Chapter 13 of the Copyright Act, 17. U.S.C §1301 through §1332, applies to the Protection of Original Designs.  §1301(a)(1) states that in general, "the designer or owner of an original design of a useful article which makes the article attractive or distinctive in appearance to the purchasing or using public may secure the protection provided by this chapter [17 U.S.C. §1301 et seq.] by complying with and subject to this chapter [17 U.S.C. §1301 et seq.]."  On the other hand, if the requirements of Chapter 13 are not complied with (registration of the design, etc.), common law and other rights are unaffected.  "Nothing in this chapter [17 U.S.C. §1301 et seq.] shall annul or limit (1) common law or other rights or remedies, if any, available to or held by any person with respect to a design which has not been registered under this chapter [17 U.S.C. §1301 et seq.]; or (2) any right under the trademark laws or any right protected against unfair competition."

Therefore in the case of the original design of a useful article which makes the article attractive or distinctive in appearance, which is _not_ validly registered under 17 U.S.C. §1301 et seq., both the federal laws and state laws may be applicable, as, unlike §301, there is no express pre-emption of the federal laws over state laws within this Chapter of the Copyright Law.

[2] Supplemental Jurisdiction is governed by 28 U.S.C. §1367, a 1990 statute.  Before 1990, Supplemental jurisdiction was governed by common law doctrines of pendent and ancillary jurisdiction.  See, e.g., _United Mine Workers v. Gibbs, 383 U.S. 715 (1966)_; _Owen Equipment & Erection Co. v. Kroger_; 437 U.S. 365 (1978); and _Finley v. United States, 490_ .U.S. 545 (1989).

those relating to the defendant's manufacture and sale of defective hats which were shipped from
New York to Florida and in some cases back to New York in interstate commerce,[3] and the
conversion of hat blocks used to make and sell hats marketed and sold in interstate commerce
over the internet and at trade shows in Florida and elsewhere.

Likewise, the Court may assert supplemental jurisdiction over the related Florida state
law claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") §501.204
(declaring unlawful "unfair methods of competition, unconscionable acts or practices, and unfair
acts or practices in the conduct of any trade or commerce"), and §501.2075 (imposing a civil
penalty of up to $10,000 per violation).  A violation of a federal law or another state's laws
against unfair competition, whether or not such other rule references FDUPTA, will likely satisfy
Florida's *per se* or automatic violation rule and result in concurrent liability under FDUPTA.

Co-plaintiff Tracey Tooker has been doing business in the state of Florida for several decades,
mainly in Palm Beach, as well as in New York City and Southampton, Long Island.  Co-plaintiff TT Ltd.
Inc. is a Florida corporation doing business in Florida and New York.  Activities of defendant Barbara
Whitworth which infringed plaintiff's rights took place within the state of Florida, and in New York.

4. Supplemental jurisdiction over state law claims turns on whether those federal
claims and the parties' many and varied state claims stem from the "same common nucleus of

---

28 U.S.C. §1367 states: "Except as provided in subsections (b) and (c) or as expressly provided otherwise
by Federal statute, in any civil action of which the district courts have original jurisdiction, the district
courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action
within such original jurisdiction that they form part of the same case or controversy under Article III of
the United States Constitution."

[3] Including claims for breach of contract, breach of implied covenant of good faith and fair dealing,
breach of implied warranty of fitness for a particular purpose, breach of fiduciary duty, civil conspiracy,
conversion, intentional infliction of emotional distress, *prima facie* tort, tortious interference with
advantageous business relationships, unfair competition, common law copyright infringement, and unjust
enrichment.

operative fact."[4]  The standard followed in the Southern District is that of "common nucleus of

operative fact", not the looser standard of "loose factual connection" as argued in some other

courts.[5]

      5.  Plaintiffs are of the view that the federal, New York, and Florida claims made

herein derive from the same "common nucleus of operative fact" and that "the relationship

between the federal and state claims is "such that the plaintiff `would ordinarily be expected to

try them all in one judicial proceeding."[6]

---

[4] *David LaChappelle et al v. Fred Torres et al*, 37 F. Supp. 3d 672 (S.D.N.Y. 2014), quoting *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 332 (2d Cir.2011) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

Judge Valerie Caproni, District Judge for the U.S. District Court for the Southern District elaborated in the *David LaChappelle* opinion, "Put differently, the question at hand is whether the relationship between the federal and state claims is "such that the plaintiff `would ordinarily be expected to try them all in one judicial proceeding."' *Id.* (quoting *Gibbs*, 383 U.S. at 725, 86 S.Ct. 1130). To make this determination, courts "have traditionally asked whether `the facts underlying the federal and state claims substantially overlapped. . . [or] the federal claim necessarily brought the facts underlying the state claim before the court.'" *Achtman v. Kirby, McInerney & Squire LLP*, 464 F.3d 328, 335 (2d Cir.2006) (alterations in original) (quoting *Lyndonville Sav. Bank*, 211 F.3d at 704). Supplemental jurisdiction is lacking "when the federal and state claims rest[] on essentially unrelated facts." *Lyndonville Sav. Bank*, 211 F.3d at 704."

[5] See *David LaChappelle*, cited above, which states:  "Plaintiffs urge that only a "loose factual connection" between a federal and state claim is necessary to invoke the Court's supplemental jurisdiction. But that standard has not been adopted in this Circuit. *See, e.g., BLT Rest. Grp. LLC v. Tourondel*, 855 F.Supp.2d 4, 10 n. 4 (S.D.N.Y. 2012) ("Given some doubt as to the viability of the `loose factual connection' standard in this circuit, we do not rely on it here."); *Rivera v. Ndola Pharmacy Corp.*, 497 F.Supp.2d 381, 387 n. 4 (E.D.N.Y.2007) (rejecting application of "loose factual connection" standard). *But see In re Sept. 11th Liability Ins. Coverage Cases*, 333 F.Supp.2d 111, 116 (S.D.N.Y.2004) (endorsing "loose factual connection" standard).  The Second Circuit has observed in dicta that the "loose factual connection" standard adopted in other courts "appears to be broader than the *Gibbs* test of `a common nucleus of operative facts.'" *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 213 (2d Cir.2004). This Court therefore does not read *Jones* as endorsing the loose factual connection standard, particularly because the Second Circuit has continued to rely upon *Gibbs* when discussing the scope of supplemental jurisdiction. *See Montefiore Med. Ctr.*, 642 F.3d at 332 (citing *Gibbs*, 383 U.S. at 725, 86 S. Ct. 1130). Accordingly, this Court will not apply the loose factual connection standard that Plaintiffs advocate."

[6] As the U.S. District Court for the Southern District elaborated in the *David LaChappelle* opinion, "Put differently, the question at hand is whether the relationship between the federal and state claims is "such that the plaintiff `would ordinarily be expected to try them all in one judicial proceeding."' *Id.* (quoting *Gibbs*, 383 U.S. at 725, 86 S.Ct. 1130)."

6.   In this case, the defendants have taken not only plaintiffs' valuable intangible property (unique design rights, and trade dress) but have also converted the valuable physical property – the wooden manufacturing molds and equipment – which are themselves unique and custom made and the medium in which the intangible property is imbedded.  From these wooden hat blocks, it is possible for defendants to quickly and easily make exact copies of plaintiffs' hats without any cost, effort or reverse engineering.  It is tantamount to stealing the lasts from which a custom shoemaker crafts his "designer" shoes, or stealing a baker's cupcake pans, from which she bakes her famous and uniquely shaped cupcakes.  Although conversion of physical property is a New York action, it is intertwined with the intangible property claims.

7.   The claims regarding the defendant's making of defective hats with holes, brown streaks, and upside down straw, while unrelated to the intellectual property claims, are related in that there is a pattern of ill-will on the part of defendants during the period during which the intellectual property claims arose, and they arose out of a common nucleus of overlapping facts.  For examples, emails sent by defendants to plaintiff's justifying mistakes made on the defective hats and including photos of plaintiffs' wood hat blocks, also offer proof that the defendants were in possession of the plaintiff's wood blocks during this time period.

8.   On the other hand, if this Court finds that the non-federal claims do not derive from a "common nucleus of operative fact" and decides to sever and remand some or all of the non-federal actions back to the New York State Supreme Court from where they originated, the Plaintiffs would have no objection.

9.   Venue herein is proper under 28 U.S.C. §1391(b)[7] since the location of the defendants' hat-making studio is in New York City, and a substantial portion of the alleged practices were committed in the State of New York, Southern District.

## II.   PARTIES

Defendant Barbara Whitworth resides in Bronxville, New York and maintains a place of business, a hat-making studio, in New York City.  Defendant Chandra Ransamie is an agent and employee of Defendant Whitworth and works at Defendant Whitworth's New York City hat-making studio.  Plaintiff Tracey Tooker resides in New York City.  Plaintiff TT Ltd., Inc. is a Florida corporation with a place of business in New York City.

## III.   PROCEDURAL HISTORY

On November 19, 2015, Plaintiffs filed a *pro se* Complaint in the Supreme Court of New York, New York County, Index Number 653813/2015.  An Ex-Parte Order to extend the time for Defendant to file an Answer was granted on December 7, 2015.  On December 18, 2015, Defendants filed a Notice of Removal to the United State District Court for the Southern District, alleging federal law claims on the face of the Complaint, and so pursuant to 28 U.S.C. §§1441 and 1446, removed the case to this Court.  On January 14, 2016, attorney Theresa K. Dilworth made an appearance in the case on behalf of Plaintiff TT Ltd., Inc.

---

[7] 28 U.S.C. §1391(b) stares: "(b)Venue in General.—A civil action may be brought in— (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."

IV.    CLAIMS FOR RELIEF

The defendants' injustices perpetrated against the plaintiffs are myriad and diverse, and mainly grouped around the following four activities of the defendants – (A) taking wooden hat blocks representing most of plaintiffs' key hat styles; (B) using plaintiff's wood hat blocks to manufacture unauthorized copies of plaintiffs' hat styles, which defendants marketed at out-of-state trade shows, on the internet, and possibly elsewhere; (C) making wood reproductions of plaintiff's wood hat blocks for the purpose of being able to continue making unauthorized copies of plaintiff's hat styles even in the event the wood blocks were returned to plaintiffs, and (D) the defective manufacture of defective hats for plaintiffs.

1.    Co-plaintiff Tracey Tooker is a couture milliner who has been designing and making handmade hats for over 30 years.  Her long list of celebrity and socialite clients include First Ladies Nancy Reagan and Hillary Clinton, Caroline Kennedy-Schlossberg, Judith Giuliani, the late Bella Abzug, Princess Yasmin Aga Khan, Meryl Streep, Glenn Close, Bianca Jagger, Aretha Franklin, Martha Stewart, Barbara Walters, Stephanie Seymour, Vera Wang, Tory Burch, Ann Ford, Ann Bass, Kentucky Derby winning horse owner Mrs. John Oxley, and the late Brooke Astor, to name a few.  Herself a debutante, she has been called "society's milliner" and "queen of hats".  Her hats sell in the range of about $475 to over $2,500, and many are custom-made and one-of –a kind.  Her sales activity takes place mainly in New York City; in Southampton, Long Island; and in Palm Beach, Florida.  She has made and sold over 50,000 hats during her career.

2.   Co-plaintiff Tracey Tooker is owner and President of TT Ltd., Inc., which is a co-plaintiff in
     this action.

3.   Defendant Barbara Whitworth is also a professional hat maker, with a 20 year career making
     and selling hats under the names of Barbara Whitworth, Barbara Whitworth Hats, and
     Barbara Whitworth Designs. Her hat-making studio was located on West 36th Street in New
     York City's Garment District.

4.   Co-defendant Chandra Ransamie is an experienced hat sewer who was previously worked for
     the plaintiffs as a sewer at Makins', her former place of employment, and during the period
     August 2014 through June 2015, was employed by defendant Barbara Whitworth.

5.   In August 2014, plaintiffs needed assistance in manufacturing hats for a pop-up shop in
     Southampton, Long Island.  Upon recommendation of a long-standing acquaintance of
     plaintiff Tracey Tooker's from design school, plaintiffs hired defendant Barbara Whitworth.

6.   There was no written contract between plaintiffs and defendants.  However, there was a
     verbal contract that plaintiff would communicate orders and instructions for the manufacture
     of specific hats to defendants.  The defendants would manufacture the hats to plaintiffs'
     order, and deliver the finished hats to plaintiffs.  The plaintiffs were to provide the raw
     materials at their own cost.

7.   Since plaintiffs had some pre-existing inventory of hats already made, the hats to be made by
     defendants generally included custom orders, and hats for which plaintiff had run out of
     inventory.

8.   In order to manufacture plaintiff's hats to plaintiffs' specifications, the defendants needed to
     use plaintiffs' wooden hat blocks, with the exception of the Shona style, where the plaintiffs

8

supplied the crown block only, and it was agree that defendants were to use their own brim block.

9.   Hat blocks are solid wood pieces shaped like a hat crown or a hat brim. Some hat styles also require a sinker, which is a piece that fits within the crown block to create an indentation in the crown.  The straw, or felt, or other material, is steamed and stretched over the wood hat block to form the exact hat shape.  In a few cases, a crown from one style can be used with a brim from a different style, to create yet another style.  The look of the hat can be varied, by using different materials, colors, and trims, to create one-of-a-kind hats.

10.  Plaintiffs' wood hat blocks were custom made to plaintiffs' specifications and represent plaintiff's unique headwear designs.  Co-plaintiff Tracey Tooker, who has a background in three-dimensional design,[8] either sculpted or crafted the block shape in three dimensions in a different material and then submitted the shape to the wood block manufacturer to be recreated in wood, or else made mechanical drawings from which the wood block maker made the wood block to the exact size and shape specified by plaintiff.

11.  Accordingly, these hat blocks were one-of-a-kind, unique, custom made hat blocks embodying plaintiffs' proprietary, self-designed hat styles.

12.  The wood hat blocks can be viewed as a necessary, if not the most necessary, piece of manufacturing equipment used in the making of hats.  The block is the pattern or mold upon which the hats are shaped.  Without the proper block, it is almost impossible to construct a hat that looks exactly like the required design.  Of course it would be possible to use another object, such as an upturned saucepan or a football, to shape a hat, but it will not have the right look.

---

[8] A modern steel chair Ms. Tooker co-designed is in the permanent collection of the Louvre Museum in Paris, France.  A graduate of the Pratt Institute and the Fashion Institute of Technology, she has also designed objects such as teakettles, alarm clocks, watches and other items for the retail market.

13.     Over the course of her 30 year millinery career, co-plaintiff Tracey Tooker had at various
        points in time been in possession of dozens of wood hat blocks.  With each passing season,
        plaintiffs retained styles that sold well, and continued them into the next season.  The styles
        that survived from one year to the next were called "runners".  Some styles came and went,
        but the "runners" survived.

14.     By August 2014, plaintiffs had accumulated about 20 or so "runners", which constituted her
        most popular selling hats, and the core of her hat collection.

15.     In August 2014, plaintiffs delivered to defendants, wood hat blocks representing 15 of
        plaintiffs' most popular styles, in order for defendants to manufacture the hats plaintiffs
        needed for the Southampton pop-up store.  All these runners except one were in plaintiffs'
        hat line since at least 1997, and one was on plaintiffs' hat line since 2001.

16.     In addition to the wood hat blocks, plaintiffs also delivered finished hat samples of five of
        plaintiffs' styles.  Defendants were to copy these samples to plaintiffs' order, if requested.

17.     Most of the wood hat blocks and the hat samples were delivered to defendants' studio on
        West 36th Street, NYC by the plaintiffs' then-assistant, Chelsea Phillips, in August 2014.

18.     Defendants used plaintiffs' hat blocks in August 2014 to manufacture hats for plaintiffs'
        Southampton pop-up store.

19.     Following the August 2014 Southampton pop-up store, defendants continued making hats to
        plaintiffs' specifications through the fall of 2014, winter of 2014/2015, and through the
        spring and early summer of 2015.

20.     Starting around November 2014, co-plaintiff Tracey Tooker went to Palm Beach, FL and
        sold her hats there at various trunk shows.

21.   In January, 2015, plaintiffs delivered to defendants' NYC studio additional wood hat blocks of plaintiffs, so that defendants could make some additional styles requested by plaintiffs' Palm Beach customers.

22.   During the period August 2014 through May 2015, about a ten-month period, defendants manufactured an estimated 31 hats for plaintiffs for Southampton, Palm Beach and New York City customers.  Defendants delivered said hats to plaintiffs.

23.   In all cases during this ten month period, the hats were paid for in full by plaintiffs, prior to delivery to plaintiff.  Payments were made by co-plaintiff TT Ltd., Inc. by credit card to defendant Barbara Whitworth.

24.   The hat blocks which were in defendants' possession for the purposes of defendants manufacturing hats for the period August 2014 through May 2015 were as follows:

WOOD BLOCKS

   a.   Barbara crown and Barbara brim

   b.   Berry crown, Berry sinker and Berry brim

   c.   Gondolier crown, Gondolier brim

   d.   Holly crown, Holly sinker, and Holly brim

   e.   Crown used for the Shona, Kate, Katherine and Martha

   f.   Kate brim

   g.   Katherine brim

   h.   Madcap crown and Madcap brim

   i.   Paige crown, Paige brim

   j.   Sailor crown, Sailor brim

k.  Tiffany crown, Tiffany brim

l.  Valentino crown, Valentino brim

m.  Wen crown, Wen brim


SAMPLES

n.  Small Fedora straw hat sample

o.  Small round crown sample

p.  Lime green beach hat sample

q.  Erica sample in felt

r.  Swivel beret sample in white pagalina

s.  Olivia sample


## DEFENDANTS' MANUFACTURE OF DEFECTIVE HATS FOR PLAINTIFFS

25.  During the period August 2014 through May 2015, plaintiffs became increasingly concerned about defendants' ability to manufacture hats to plaintiffs' standards and specifications. While the prior practice was for defendants to mail finished custom order hats directly to the customers, plaintiffs began requesting that the hats be sent to plaintiffs first, so that plaintiffs could inspect them.

26.  Upon inspection of the hats manufactured by defendants, plaintiffs discovered many errors and faults in fourteen of the hats, including holes in the hats, faulty sewing, uneven stitching, brown spots and streaks in the straw that should have been cut out prior to sewing the straw, smooth side of the straw facing down and the rough side facing up (backwards), brim of the

hat upside down, indentations on the brim, brims of the wrong width, hats delivered in a different style than requested, and hats of the wrong shape.

27.   In some cases the holes in the hats were three-quarters of an inch to an inch long.

28.   In one case, there were so many thick threads randomly sticking out of the hat, that they looked like worms.

29.   In one case, a hat had to be redone not once, not twice, but three times.

30.   The holes, brown streaks, and other defects in the hats were beyond mere oversights, but appeared deliberately and maliciously inflicted by defendants.  The defects went beyond any standard of normal care and professionalism in manufacture, particularly considering the end product was a hat that sold for $475 to over $1,000 and up.  These were not small, unnoticeable defects, but rather large, glaring defects that made the hats unsellable.

31.   Co-defendant Chandra Ransamie, as the sewer of the hats, was principally responsible for these defects, as most would have been incurred at the sewing stage.  Since Ms. Ransamie had previously worked for the plaintiffs for several years, plaintiffs knew the high quality of co-defendant's previous work, yet this latest work was substandard.

32.   Co-defendant Barbara Whitworth, herself a professional milliner for decades, would have been in the position of supervising and inspecting Ms. Ransamie's work, however she obviously failed to do so or did not exercise care in doing so.

33.   The level of defects was so egregious, and so unlike a professional sewer or professional milliner, and so below the normally accepted standards of hat making quality, that it would be impossible to believe that such defects could have been missed by the eyes of two individuals who were career-long hat making professionals.  The only conclusion that can be

reached is that the defendants deliberately sent plaintiff hats with holes, brown streaks and other defects in order to harass, annoy and otherwise cause harm to the plaintiffs.

34.    Since almost half the hats manufactured by defendants for plaintiffs were defective, plaintiffs incurred (a) substantial costs in shipping the defective hats back to defendants for reworking, (b) labor costs of reworking through plaintiffs' own employees, (c) wasted materials used to manufacture the defective hats and additional cost of materials for the replacement hats, (d) labor cost of stripping trims off defective hats to re-use elsewhere, (e) administrative costs, (f) delays in delivering custom-ordered hats to customers, (g) loss of credibility among plaintiffs' customers, (h) shortages or outages of inventory of plaintiffs' most popular styles, and (i) considerable angst for plaintiffs.

35.    Plaintiffs' customers are amongst the highest-profile, wealthiest, most stylish and most discerning women in the world.  They do not tolerate untoward delays in making their custom hats.  And they certainly do notice if there are holes or brown streaks, or if the style delivered is not the style ordered.

36.    When plaintiffs complained to co-defendant Barbara Whitworth, she replied "the customers won't notice".

37.    To add insult to injury, defendants charged plaintiffs to correct the mistakes, therefore charging double.

38.    The causes of action that arise from defendants' behavior are as follows.

39.    First, breach of contract.  An oral contract existed between plaintiffs and defendants, [9] and the parties acted according to the contract, with orders being transmitted, hats made to order

---

[9]  The elements of a contract were met, i.e. offer, acceptance, and consideration. See *U.S. Bank National Association v. Lieberman*, 98 A.D. 3d 422, (1st Dept 2012), citing *Harris v. Seward Park Housing. Corp.*, 79 A.D.3d 425, 426, 913 N.Y.S.2d 161 (2010) [the essential elements of a cause of action for breach of contract are the existence of a contract, the plaintiff's performance under the contract, the defendant's

and delivered, and payments made.   Plaintiffs performed their duties under the contract, and

defendants did not perform under the contract, causing damages through loss of time and

money to plaintiffs.

40.    Second, breach of implied covenant of good faith and fair dealing, which "embraces a pledge that

neither party shall do anything which will have the effect of destroying or injuring the right of the

other party to receive the fruits of the contract."[10] Under New York law, a covenant of good faith

and fair dealing is implicit in all contracts during the course of contract performance.[11]

Plaintiffs and defendants were parties to a contract, defendants acted to deprive plaintiffs of

the right to receive the benefits under the agreement, and the implied covenant of good faith

and fair dealing is completely consistent with the contract.

41.    Third, breach of an implied warranty for fitness of purpose.   "To prevail on a claim of breach of

express warranty, a plaintiff must show "an `affirmation of fact or promise by the seller, the natural

tendency of which was to induce the buyer to purchase' and that the warranty was relied upon." [12] The

defendants, as manufacturers and sellers of hats, had reason to know the purpose for which

the goods were intended.   The defendants/sellers knew or had reason to know that the

---

breach of that contract, and resulting damages]. See also *RIJ Pharm. Corp. v. Ivax Pharms., Inc.*, 322 F. Supp. 2d 406, 412 (S.D.N.Y. 2004) ("To maintain a claim for breach of contract, contract, plaintiff must plead: "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach."

[10] See., e.g. *ABN AMRO Bank., N.V. v. MBIA, Inc.*, 17 N.Y. 3d 208, 228-29 (2011):  "Of course, the implied covenant of good faith and fair dealing "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" citing *Dalton v Educational Testing Services*, 87 N.Y.2d 384, 389 [1995]."

[11] *Tractabel Energy Marketing v. AEP Power Marketing*, 487 F. 3d 89, 98 (2d Cir. N.Y. 2007), citing *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995).   See also *Diamond Services Management, LLC v. Fable Jewelry Co.*, No. 12 Civ. 3543, 2012 U.S. Dist. LEXIS 165899, at 13-14 (S.D.N.Y. Nov. 20, 2012).

[12]*Factory Associates & Exporters, Inc. v. Lehigh Safety Shoes Co.*, LLC 382 Fed. Appx. 110, 111-12 (2d Cir. 2010), citing  *Schimmenti v. Ply Gem Industries, Inc.*, 549 N.Y.S.2d 152, 154 (App. Div. 1989).

buyer/plaintiff was relying on the defendants/sellers' skill or judgment to select or furnish

suitable goods for the specified purposes, and the buyer/plaintiff relied on the

defendants/sellers' skill or judgment. [13]

42.   Fourth, civil conspiracy. "Under New York law, to establish a claim of civil conspiracy, the

plaintiff "must demonstrate the primary tort, plus the following four elements: (1) an

agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3)

the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting

damage or injury.".[14]   Based on their conduct, it is apparent that the co-defendants, Barbara

Whitworth and Chandra Ransamie, had an agreement amongst them, and intentionally

participated in furtherance of a plan or purpose resulting in damage to plaintiffs.

43.   Fifth, tortious interference with advantageous business relationships. "To prevail on a claim

for tortious interference with business relations in New York, a party must prove (1) that it

had a business relationship with a third party; (2) that the defendant knew of that relationship

and intentionally interfered with it; (3) that the defendant acted solely out of malice or used

improper or illegal means that amounted to a crime or independent tort; and (4) that the

---

[13] See *Dayton Superior Corp. v. Spa Steel Products, Inc*., No. 1:08-CV-1312 (FJS/RFT), 2012 U.S. Dist. LEXIS 4283, at 16-17 (N.D.N.Y. 2012); *Saratoga Spa & Bath v. Beeche Sys. Corp.,* 230 A.D. 2d 326, 331 (3d Dept. 1997); and N.Y.C.L.S. U.C.C. §2-315 (2013 (implied warranty of fitness for a particular purpose.)  See also *B&M Linen Corp. v. Kannegiesser USA Corp*., No. 08 Civ. 10093 (LAP), 2013 U.S. Dist. LEXIS 37982 at 19 (S.D.N.Y. Mar. 19, 2013).

[14] *Abacus Federal Savings Bank v. Lim*, 75 A.D. 3d 472, 475 (1st Dept 2010), citing *World Wrestling Federation. Entertainment, Inc. v Bozell*, 142 F Supp 2d 514, 532 [SD NY 2001].  See also *Alexander & Alexander, Inc. v. Fritzen*, 68 N.Y. 2d 968,969 (1986) ("The obligation of loyalty implied by the relationship between an employee and his (her) employer rests upon the rule that a person who undertakes to act for another shall not in the same matter act for himself (herself). (*Maritime Fish Prods. v World-Wide Fish Prods.*, 100 A.D.2d 81, 87-88 [1st Dept 1984], *appeal dismissed* 63 N.Y.2d 675; *Foley v D'Agostino*, 21 A.D.2d 60, 66-67 [1st Dept 1964]; *Marshall v Sackett & Wilhelms Co.*, 181 App Div 157, 158 [2d Dept 1917]; 52 NY Jur 2d, Employment Relations, § 205.")

See also *Bigio v. Coca-Cola Co*., 675 F. 3d 163, 176 (2s Cir. 2012) and *Schatzki v. Weiser Capital Management, LLC*, No. 10 Civ. 4685, 2013 U.S. Dist.  LEXIS 168572, at 47 *S.D.N.Y. Nov. 26, 2013.)

defendant's interference caused injury to the relationship with the third party."[15]  Plaintiffs

had business relationships with third parties, namely the identified custom-order hat

customers.  Defendants knew of these business relationships, as evidenced by emails between

plaintiff and defendants about these customers, and intentionally interfered with these

relationships.  Defendants acted solely out of malice.  In the alternative, defendants used

improper means which amounted to an independent tort, and defendants' interference caused

injury to plaintiffs.

## DEFENDANTS' UNAUTHORIZED USE OF PLAINTIFFS' HAT BLOCKS TO MAKE AND SELL HATS FOR DEFENDANT'S OWN PROFIT

44.   During the period from August 2014 through May 2015, while defendants were in possession

of plaintiffs' hat blocks and hat samples, the defendants used plaintiffs' wood hat blocks to

make copies of plaintiffs' original hat styles and market them at trade shows and on the

internet, as if they were defendants' styles.  The plaintiffs did not discover this until the fall

of 2015, after plaintiffs' and defendants' business relationship ended.

45.   Plaintiffs lent defendants their wood hat blocks starting in August 2014 solely for the purpose

of defendants making hats to plaintiffs' specifications, as contractor for plaintiffs.

Defendants were in no way authorized to use plaintiffs' blocks to make "knock-offs" or

imitations of plaintiffs' hat designs for sale elsewhere, under defendants' own name and for

defendant's own profit.

---

[15] *Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D. 3d 40, 47 (1st Dept. 2009), citing *Carvel Corp. v Noonan*, 3 N.Y.3d 182, 189 [2004]; *NBT Bancorp v Fleet/Norstar Fin. Group*, 87 N.Y.2d 614 [1996]; and *Guard-Life Corp. v Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183 [1980].

46.    Defendants manufactured hats using plaintiffs' hat blocks and exhibited them at two trade
       shows in November 2014, according to information publicly available on the internet. The
       defendants may have sold hats elsewhere as well.

47.    Defendants' Facebook page is called Whitworth Hats – Shopping & Retail, and is located on
       the web at www. Facebook.com/Whitworth-Hats. One trade show was in Florida, and a
       photograph was posted on defendants' Facebook page on November 9, 2014, with a caption,
       "Whitworth Hats shows in Florida!  Take Cover in Style!"

48.    The Nov. 9, 2014 photograph of the trade show shows tables of defendants' hats, and mixed
       in amongst defendants' styles are several clearly identifiable examples of plaintiffs' hat
       designs, obviously made using plaintiffs' hat blocks, which were in defendants' possession.

49.    The hats made using plaintiffs' wood blocks are identifiably different from defendants' pre-
       existing hat styles, which are clearly shown on defendants' other Facebook postings and on
       defendants' website.

50.    In the November 19, 2014 photograph, there is a light-colored hat on the left side which is a
       copy of plaintiffs' Wen/Barbara style, using plaintiffs' wood blocks delivered to defendants
       in August 2014.

51.    The right side of the back table in the November 19, 2014 photograph shows three hat styles
       which are made from wood blocks that plaintiff left with defendants in August 2014.  These
       are the Gondolier (crown block and brim block), the Berry (crown block and brim block),
       and a hat using the Valentino crown block.

52.    On the back table as well as on the left side of the photo are a couple of examples of the
       small fedora, which is a copy of one of the sample hats left by plaintiffs with defendants in
       August 2014.

53.    In the November 19, 2014 trade show photograph, on the table on the right side there are several examples of visors that are copies of the Martha visor from plaintiff's website, but made using plaintiff's Valentino wood brim block left with defendants in August 2014.

54.    The back table in the November 19, 2014 photograph shows several copies of the Tracey Tooker large cowboy, a hat which had been on Tracey Tooker's line for decades, although plaintiff had provided defendants with neither the wood blocks nor samples of this style.

55.    Photographs of a second trade show were posed on Pinterest.  The location of the trade show is unknown.  The date that the photograph was posted was approximately November, 2014.  The exact date of the posting is not indicated, but as of early November 2015, the Pinterest caption indicates "1 year ago".

56.    In the Pinterest trade show photograph, there are two clear examples of Tracey Tooker's styles, in sharp contrast to Barbara Whitworth's other hat styles.  On the left side, there is a straw hat made using plaintiffs' Tiffany crown block, and next to that a hat made using plaintiff's Shona crown block, both blocks having been left with defendants in August 2014.

57.    Besides selling unauthorized copies of plaintiffs' designs at trade shows, defendants marketed other hats on Facebook and Twitter that were made using plaintiff's hat blocks.

58.    A June 7, 2015 Facebook post shows defendant Barbara Whitworth wearing a hat made using plaintiff's small round crown block.  Plaintiffs had left a sample of this style with defendants in August 2014.

59.    A June 9, 2015 photo posted on Facebook is showing a beret copied from plaintiff's swivel beret sample that plaintiff had left with defendant in August 2014.

60.    Defendants also marketed their hats on Twitter, under the name Whitworth Hats (Twitter name @WhitworthHats, on the web at www.twitter.com/WhitworthHats).  The Twitter

tweets tend to refer to the Facebook postings. Therefore, for example, on November 9, 2014 the defendants advertised the Florida trade show on Twitter, and the link went over to the November 9, 2014 Facebook posting about the trade show.

61.  The causes of action that arise from defendants' behavior are as follows.

62.  First, breach of contract. A contract existed between plaintiffs and defendants. Defendants were to make hats using plaintiffs' hat blocks and samples, at the request of, and solely for, plaintiffs. There was no authorization by plaintiff allowing defendants, whether in exchange for a royalty fee or not, to use plaintiffs' wood blocks to create and sell defendant's own hats. Plaintiffs performed their duties under the contract, and defendants did not perform under the contract, causing damages to plaintiffs.

63.  Second, breach of implied covenant of good faith and fair dealing. Plaintiffs and defendants were parties to a contract under which defendants were to make plaintiffs' hats using plaintiffs' wood blocks and samples. By making, marketing and selling their own hats using plaintiffs' hat blocks, defendants acted to deprive plaintiffs of the right to receive the benefits under the agreement. The implied covenant of good faith and fair dealing is entirely consistent with the contract.

64.  Third, breach of fiduciary duty. "In New York, a claim for breach of fiduciary duty consists of the following elements: "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." [16] Between plaintiffs and their contract manufacturer, a fiduciary duty exists. A fiduciary relationship is founded upon trust or confidence reposed by one person in the integrity and fidelity of

---

[16] *Hoyle v. Dimond*, 947 F.2d 595, 24 (W.D.N.Y. 2013), citing *Rut v. Young Adult Inst., Inc.,* 901 N.Y.S.2d 715, 717 (App.Div. 2010). See also *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y. 2d 413, 424 (1996); *Johnson v. Nextel Communications, Inc.* 660 F. 3d 131 138 (2d Cir. 2011, and *Soley v. Wasserman,* No. 08 Civ. 9262 (KMW) (FM), 2013 U.S. Dist. LEXIS 98774, at 2 (S.D.N.Y. July 15, 2013)>

another.  Plaintiffs entrusted defendants with core proprietary designs as embodied in the manufacturing molds, i.e., the blocks of wood, for the sole purposes of making hats for the plaintiffs.  Defendants' misconduct, including self-dealing, acting with a conflict of interest, and acting contrary to the interests of plaintiffs, breached the fiduciary duty and caused injury and damages to plaintiffs.

65.     For co-defendant Chandra Ransamie, liability for aiding and abetting a breach of fiduciary duty.  "Liability for aiding and abetting a breach of fiduciary duty requires establishing the following elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation."[17]  The party whom the defendant (i.e. Chandra Ransamie) aids (i.e. Barbara Whitworth) has performed a wrongful act that causes an injury, the defendant (Chandra Ransamie) was aware of her role as part of an overall illegal or tortious activity at the time she provided assistance, and Ms. Ransamie knowingly and substantially assisted the principal violation.

66.     Fourth, civil conspiracy.  The co-defendants, Barbara Whitworth and Chandra Ransamie, had an agreement amongst them, and intentionally participated in furtherance of a plan or purpose resulting in damage to plaintiffs.  In New York, a mere conspiracy to commit a tort is not itself a cause of action, but allegations of conspiracy are permitted to connect the actions of separate defendants with an otherwise actionable tort.

67.     Fifth, unfair competition and misappropriation of trade secrets under New York law.  The principle that one may not misappropriate the results of the skill, expenditures, and labors of

---

[17] *Aetna Life Insurance Co. v. Appalachian Asset Management Corp.*, 110 A.D. 3d 32, 42 (1ˢᵗ Dept 2013)., citing *Halberstam v Welch*, 705 F2d 472, 477 [DC Cir 1983]; and *Efthimiou v Smith*, 268 Conn 499, 505, 846 A2d 222, 226 [2004].

a competitor has often been upheld in New York courts.  "We have long recognized two

theories of common-law unfair competition: palming off[18] and misappropriation."

68.     Misappropriation is ""[t]he principle that one may not misappropriate the results of the skill,

expenditures and labors of a competitor has . . . often been implemented in [New York]

courts."[19]   "Defendant misappropriated the fruits of Plaintiff's labor by obtaining access to

plaintiff's ideas through fraud or deception, or the abuse of a fiduciary or confidential

relationship; and (1) the defendant's activities have caused confusion with, or have been

mistaken for, the plaintiff's activities in the mind of the public, or are likely to cause such

confusion or mistake; or (2) that the defendant has acted unfairly in some manner."[20]

69.     "'While [t]here is no complete list of the activities which constitute unfair competition, [t]he

general principle . . . is that commercial unfairness will be restrained when it appears that

there has been a misappropriation, for the commercial advantage of one person, of a benefit

or property right belonging to another.'"[21]

---

[18] Palming off, "the sale of the goods of one manufacturer as those of another – was the first theory of unfair competition endorsed by New York courts, and 'has been extended . . . to situations where the parties are not even in competition.'" *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007). "[I]n an action for unfair competition a showing of a likelihood of confusion, rather than actual confusion, is all that is required to state a cause of action." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 543 (1977).

[19] *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007).

[20] *KG2, LLC v. Weller*, 105 A.D.3d 1414, 1415 (4th Dep't 2013).

[21] *IDG USA, LLC v. Schupp*, No. 10-CV-76S(F), 2012 U.S. Dist. LEXIS 151554, at *31-32 (W.D.N.Y. Oct. 21, 2012). See also *Gameologist Group, LLC v. Sci. Games Int'l, Inc.*, 508 Fed. Appx. 31, 33 n.2 (2d Cir. 2013) (palming off); *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 895 (2d Cir. 2011); *C&L International Trading, Inc. v. American Tibetan Health Institute, Inc.*, No. 13 Civ. 2638 (LLS) & 13 Civ. 2763 (LLS), 2013 U.S. Dist. LEXIS 164393, at *13-14 (S.D.N.Y. Nov. 18, 2013) (misappropriation); and *Zino Davidoff SA v. Selective Distrib. International*, No. 07 Civ. 10326 (PAE) (MHD),2013 U.S. Dist. LEXIS 47457, at *31-33(S.D.N.Y. Mar. 8, 2013) (palming off and misappropriation).

70.   The first element has been met, because the defendants misappropriated the fruits of

plaintiffs' labor by obtaining access to plaintiff's ideas through the abuse of a confidential

relationship.  As a second element, defendant has acted unfairly.  As an alternative second

element, defendant's activities are likely to confusion or mistakes in the mind of the public -

particularly since one of the trade shows was in Florida, a key market for plaintiffs for many

years.  Defendants' hats are targeted toward the UV-protection, skin cancer market and sell

for a fraction of the price for what plaintiffs hats sell for, and therefore likely to cause

confusion among Tracey Tooker's and Barbara Whitworth's customers.

71.   Sixth, unfair competition under the Florida Deceptive and Unfair Trade Practices Act

("FDUPTA") §501.204 (declaring unlawful "unfair methods of competition, unconscionable

acts or practices, and unfair acts or practices in the conduct of any trade or commerce"),

and§501.2075 (imposing a civil penalty of up to $10,000 per violation).

72.   Seventh, copyright infringement under common law.  While several courts have held that the

federal law pre-empts common law copyright,[22] *Capital Records, Inc. v. Naxos of America,*[23]

which provides a history of copyright law from the England in the 15th century to America in

the 1700's till today, leaves open the possibility that the Copyright Act of 1976 does not

completely abrogate common law in all respects, especially in the case of copyrights not

registered under the Copyright Act..  A common law copyright existed through plaintiff's

three decades of making, marketing and selling hats of these unique designs.  In addition, the

custom made and custom designed wooden hat blocks incorporated the plaintiff's intangible

---

[22] See. e.g., *Buday v. New York Yankees Partnership,* 486 Fed. Appx. 894, 896-97 (2d Cir. 2012; *Rommel v. Laffey,* 194 F.R.D. 441, 444 (N.D.N.Y. 2000) and *Patrick v. Francis,* 887 F. Supp. 481,483-84 (W.D.N.Y. 1995).

[23] *Capital Records, Inc. v. Naxos of America,* 4 N.Y. 3d 540.

property into tangible property, as did the physical samples.  Defendants' unauthorized use of the wood blocks and samples to reproduce plaintiffs' designs into the manufacture of defendant's own hats is therefore an infringement of plaintiff's copyrights.

73. Eighth, infringement of protected original designs of useful articles under Chapter 13 of the federal Copyright Act, specifically 17 U.S.C. §1301(a)(1) which states that in general, "the designer or owner of an original design of a useful article which makes the article attractive or distinctive in appearance to the purchasing or using public may secure the protection provided by this chapter [17 U.S.C. §1301 et seq.] by complying with and subject to this chapter [17 U.S.C. §1301 et seq.]." If the requirements of Chapter 13 are not complied with (registration of the design, etc.), common law and other rights are unaffected. "Nothing in this chapter [17 U.S.C. §1301 et seq.] shall annul or limit (1) common law or other rights or remedies, if any, available to or held by any person with respect to a design which has not been registered under this chapter [17 U.S.C. §1301 et seq.]; or (2) any right under the trademark laws or any right protected against unfair competition." Therefore in the case of the original design of a useful article which makes the article attractive or distinctive in appearance, which is *not* validly registered under 17 U.S.C. §1301 et seq., both the federal laws and state laws may be applicable, as, unlike §301, there is no express pre-emption of the federal laws over state laws within this Chapter of the Copyright Law.

74.   The plaintiff's original hat designs as embodied in her unique, made to order, wood hat blocks made the hats more attractive and distinctive in appearance.  These were her best-selling designs culled from decades of selling to the wealthy Palm Beach, Southampton and New York City socialites and celebrities.  These hats had unique elements of style, shape, angle, height, width, and/or slant that were independent of the utilitarian nature of the hat, and it was those unique design elements that made the hats attractive and desirable.  During the infringement period Defendants had sole physical access to the plaintiffs' wood blocks from which to make the hat designs, and so the act of copying

necessarily took place upon the defendant's use of the plaintiffs' wood hat blocks to make copies of the hat styles.

75.    Ninth, infringement of the Plaintiff's protected trademark and trade dress under the Lanham Act, 15 U.S.C. §1125 (a)(1).[24]  Pursuant to 15 U.S.C. §1117(a), where such infringements is willful, plaintiffs are entitled to double monetary damages and attorney's fees.[25]  See *Moza Inc., et al v. Brasseur Inc., et al*, 10-cv11865 (July 31, 2012), in the U.S. District Court for the Eastern District in Michigan, where the designer of the hat that Aretha Franklin wore to the Obama inauguration successfully won a default judgment, double monetary damages, and attorney's fees in an action against competing hat makers who copied the design; the plaintiffs sued therein for infringements of trademark and trade dress under the Lanham Act §1125.[26]  Other fashion clothing designers have also successfully sued for trademark and trade dress infringement under the Lanham Act.[27]

76.    15 U.S.C. §1125 (c) states that: (3) "In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade

---

[24] 15 U.S.C. §1125 (a)(1) states that "any person who, on or in connection with any goods or services.... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act."  See, e.g. *Pop Bar, LLC, v. Anthony L. Fellows and Hip Pops, et al,* 12 Civ. 06647, 2013 U.S. Dist. LEXIS 117739, at 17 (S.D.N.Y. 2013).

[26] The plaintiffs in that case were awarded approximately $246,000.

[27] See, e.g., *River Light V, L.P and Tory Burch LLC v Lin & J International, et al*, 1:2013cv03669 (S.D.N.Y. 2015), in which plaintiffs were awarded $38.9 million in damages and $2.3 million in attorney's fees; the plaintiffs won a summary judgment for trademark infringement under §1125(a) and trademark counterfeiting under §114(a)(1) of the Lanham Act, and *Diane von Furstenberg Studio v. Catherine Snyder*, 1:06 cv1356 (JCC) (E.D. Va. June 25, 2007), *affirmed* No. 07-2172 (4th Cir. 2008), in which the plaintiff was awarded $100,000 in statutory damages on DVF's claims of trademark counterfeiting, trademark infringement, unfair competition, and trademark dilution under the Lanham Act.

dress protection has the burden of proving that the matter sought to be protected is not functional."

77.    Trade dress is generally defined as the "total image" of a product. When a customer walks into a store and sees shelves of nearly identical products, "trade dress" is what distinguishes one product from another. Trade dress includes the size, shape and color of the product and its packaging. In another words, "trade dress" allows customers to pick out their favorite products, or to distinguish products.

78.    While hats in general arguably serve a useful purpose, such as keeping the head warm or cool or protecting from the elements, they also serve a non-functional one, being in many cases purely decorative. That is particularly the case with plaintiff's couture hats, which are worn for style and fashion.

79.    One need only look at plaintiff's website to understand what "trade dress" means in the context of hat styles. She has several pages of straw hats, with different sizes and shapes of crown and different sizes and shape and depth of brim. Each hat style is different. Even if made in identical material, a Shona is different from a Martha, and both are different from a Kate or a Madcap or a Wen or a Holly. It is clear that each style has esthetic and decorative elements that are distinguishable from the functional elements.

80.    To establish an infringement of trade dress, the plaintiffs must show that they own the trade dress, that it is distinctive, that the use is non-functional, and that the defendants used the plaintiff's trade dress without the consent of the plaintiff in a manner that is likely to cause

confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods.[28]

81.     Tenth, unjust enrichment.[29]  Defendants benefited from having unrestricted and unauthorized access to the wood blocks and samples representing decades of plaintiff's best-selling runners.  Defendants benefitted at plaintiffs' expense.  Equity and good conscience require restitution.


## DEFENDANTS' CONVERSION OF PLAINTIFFS' HAT BLOCKS

82.     On or before May 5, 2015, co-plaintiff Tracey Tooker informed co-defendant Barbara Whitworth that plaintiff needed three of her hat blocks back – the Tiffany, the Shona and the Madcap, as well as some of plaintiffs' straw.  Plaintiffs wanted to pick up these items on May 5, 2015.  Co-defendant Barbara Whitworth claimed by text message that neither she nor co-defendant Chandra Ransamie were in all week, that she was at a trade show and Chandra was in Guyana, and so therefore the blocks could not be picked up.  Through a series of text messages on May 5, 2015, Ms. Tooker and Ms. Whitworth attempted to arrange for Ms. Whitworth to leave the blocks with the doorman until Ms. Tooker could arrange for someone

---

[28] See, e.g. Manual of Model Civil Jury Instructions , Chapter 15, Section 15.6 Infringement—Elements and Burden of Proof—Trade Dress, as it appears on the Jury Instructions web page of the United States Court for the Ninth Circuit, at http://www3.ce9.uscourts.gov/jury-instructions/node/234.

[29] As stated by the Court of Appeals of New York in *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y. 3d 173 (2011), "the essential inquiry in any action for unjust enrichment …. is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered" (*Paramount Film Distrib. Corp. v State of New York*, 30 AD3d 415, 421 [1972]).  A plaintiff must show "that (1) the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered' " *Citibank, N.A. v Walker*, 12 AD3d 480, 481 [2d Dept 2004]; *Baron v Pfizer, Inc.*, 42 AD3d 627, 629-630 [3d Dept 2007].

to come pick them up.  However Ms. Whitworth texted that the blocks would be left

unattended in the public hallway and that she would not be held responsible.

83.     Upon checking with the defendant's building's security desk downstairs, the plaintiffs later

discovered that the defendants had indeed signed into the building and were in that week, and

that the story about being out all week and unable to leave blocks with the doorman was an

utter fabrication, intended to harass and annoy plaintiffs.

84.     Plaintiffs made a second attempt to recover all her blocks, as well as the samples that had

been left, and plaintiffs' straws and other raw materials, on June 15, 2015.

85.     In June 2015, plaintiffs' assistant Lisa McLellan made arrangements with defendants to pick

up all the hat blocks.  On June 15, 2015, co-plaintiff Tracey Tooker along with her assistant

Lisa McLellan visited defendants' hat-making studio.  Both Barbara Whitworth and Chandra

Ransamie were present at Ms. Whitworth's studio.

86.     On June 15, 2015, at first defendants agreed to return some, but not all, of plaintiffs' hat

blocks.  The blocks that were to be returned were left in a pile by the defendants' door.

Included in the pile were the three blocks that plaintiffs had unsuccessfully attempted to get

back on May 5, 2015 – the Tiffany, the Shona and the Madcap.

87.     When co-plaintiff Tracey Tooker noted to defendants that not all of her hat blocks were in

the pile of blocks on the floor being returned, and that some of plaintiffs' hat blocks were still

visibly sitting on defendant's shelves on the walls of the studio, defendant Barbara

Whitworth called the police.

88.     After the police arrived, co-plaintiff Tracey Tooker and her assistant were forced to leave

defendants' studio and wait out in the hallway while the police officer spoke to defendants

Barbara Whitworth and Chandra Ransamie.

89.   When co-plaintiff Tracey Tooker and her assistant were allowed back into defendants'
studio, the police officer requested them to leave.  Plaintiff and her assistant left with an even
smaller group of hat blocks than the original group of hat blocks in the pile before the police
officer arrived.  Specifically, the Tiffany, Shona, and Madcap crown blocks, which were on
the pile before the police officer arrived, were now no longer included in the pile.  No doubt,
the defendants surmised that these were important hat blocks to plaintiff, so defendants
purposely moved them off the pile while the plaintiff and her assistant were waiting in the
hallway.

90.   Upon returning to her own studio, co-plaintiff's assistant Lisa McLellan drew up a written
inventory of the hat blocks, samples, and straws that defendants returned on June 15, 2015.

91.   With respect to the wood blocks, in some cases defendants returned full sets (crown and
brim).  In some cases defendants returned only the brim of a set, retaining the crown. In some
cases the defendants returned neither the crown block nor the brim block and retained both
the crown block and brim block in their possession.

92.   With respect to the samples, defendants returned some to plaintiffs, and not others.

93.   The hat blocks and samples retained by defendants and not returned to plaintiffs are:


WOOD BLOCKS

a.   Barbara crown and Barbara brim

b.   Berry crown, and Berry sinker

c.   Holly sinker

d.   Crown used for the Shona, Kate, Katherine and Martha

e.   Kate brim

f.  Madcap crown

g.  Sailor crown, Sailor brim

h.  Tiffany crown

i.  Valentino crown


SAMPLES

j.  Small Fedora straw hat sample

k.  Small round crown sample

l.  Lime green beach hat sample

m.  Erica sample in felt

n.  Swivel beret sample in white pagalina

o.  Olivia sample


94.  Plaintiff Tracey Tooker initiated a Small Claims Court action on July 2, 2015 in an attempt to

get her wood blocks back.  A hearing was held on September 10, 2015, at which time Tracey

Tooker explained her story.  After this, the Small Claims Court employee asked Barbara

Whitworth whether she had any of Ms. Tooker's property in her possession, and Ms.

Whitworth said "No."

95.  The plaintiff's causes of action are as follows. First, conversion.  "The two key elements of

conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's

dominion over the property or interference with it, in derogation of plaintiff's rights."[30]  The

---

[30] *Pappas v. Tzolis*, 20 N.Y.3d 228, 234 (2012) (quoting *Colavito v New York Organ Donor Network, Inc.*, 8 NY3d 43, 49-50 (2006)).

plaintiff must be able to show "legal ownership *or* an immediate superior right of possession."[31]

96.   "[W]here possession of property is initially lawful, conversion occurs when there is a refusal to return the property upon demand."[32]

97.   Plaintiffs had a possessory right or interest in the wood hat blocks as well as in the hat samples. Co-plaintiff Tracey Tooker designed the wood blocks, had them custom carved in wood, and used the blocks for decades in the manufacture of her own hats. She has a product order book from 1997 and a fax from 2002 which indicated that all the styles but one were already on her line since 1997. Only the Berry block came later, in 2010, and Plaintiffs still have the 2010 invoice from the block maker, La Mode Hats West, for the making of that block. Plaintiff Tracey Tooker also hand-crafted the samples. Defendants have refused to return the hat blocks and samples. Defendants are exercising dominion over plaintiff's property in derogation of plaintiffs' rights.

98.   Second, breach of contract. A contract existed between plaintiffs and defendants. Defendants were to make hats using plaintiffs' hat blocks and samples, at the request of and for plaintiff. Upon completion of the contract, defendants were to return plaintiffs' hat blocks and samples. Plaintiffs performed their duties under the contract, and defendants did not perform under the contract, causing damages to plaintiffs.

---

[31] *Tudisco v. Duerr*, 89 A.D.3d 1372, 1373 (4th Dep't 2011). See also *Winfield Group, Inc. v. Erie Ins. Group*, No. 12-4499-cv, 2013 U.S. App. LEXIS 17559, at *1-2 (2d Cir. Aug. 22, 2013); *AEP Energy Services Gas Holding Co. v. Bank of America, N.A.*, 626 F.3d 699, 736-37 (2d Cir. 2010); and *WSP United States Corp. v. Marinello*, No. 13 Civ. 4591 (PKC), 2013 U.S. Dist. LEXIS 178419, at *18 (S.D.N.Y. Dec. 19, 2013).

[32] *Salatino v. Salatino*, 64 A.D.3d 923, 925 (3d Dep't 2009); *see also Dudek v. Nassau County Sheriff's Dep't*, No. 12-CV-1193 (PKC), 2013 U.S. Dist. LEXIS 164740, at *49-50 (E.D.N.Y. Nov. 19, 2013) ("Where the claim involves a plaintiff's property, whose possession by a defendant is 'originally lawful' but later becomes a 'wrongful withholding,' a demand that the property be returned is a procedural 'condition precedent' to asserting the claim.").

99.    Third, breach of implied covenant of good faith and fair dealing.  Plaintiffs and defendants
were parties to a contract under which defendants were to make plaintiffs' hats to plaintiff's
specifications using plaintiffs' hat blocks and samples.  By failing to return the hat blocks
and samples, defendants acted to deprive plaintiffs of the right to receive the benefits under
the agreement.

100.   Fourth, breach of fiduciary duty.  A fiduciary duty exists in all cases in which confidence has
been reposed and betrayed.  The rule encompasses both technical fiduciary relations and
those informal relations that exist whenever one man (or woman) trusts in, or relies upon,
another.  Under New York law, such a relationship might be found to exist, in appropriate
circumstances, between close friends or even where confidence is based upon prior business
dealings.  Between plaintiffs and their contract manufacturer, a fiduciary duty existed since
plaintiffs entrusted defendants with manufacturing equipment embodying plaintiffs' valuable
intellectual property.  Defendants' conversion of the hat blocks constituted self-dealing,
acting with a conflict of interest, and acting contrary to the interests of plaintiffs, causing
injury and damages to plaintiffs.

101.   For co-defendant Chandra Ransamie, liability for aiding and abetting a breach of fiduciary
duty.  The party whom the defendant (i.e. Chandra Ransamie) aids (i.e. Barbara Whitworth)
has performed a wrongful act that causes an injury, the defendant (Chandra Ransamie) was
aware of her role as part of an overall illegal or tortious activity at the time she provided
assistance, and Ms. Ransamie knowingly and substantially assisted the principal violation.

102.   Fifth, civil conspiracy.  The co-defendants, Barbara Whitworth and Chandra Ransamie, had
an agreement amongst them, and intentionally participated in furtherance of a plan of
conversion, resulting in damage to plaintiffs.

103.    Sixth, the taking of the wood blocks amounted to unfair competition.  While there is no

complete list of activities which constitute unfair competition, the general principle is that in

the New York courts, commercial unfairness will be restrained when it appears that there has

been a misappropriation, for the commercial advantage of one person, of a benefit or

property right belonging to another person.  The defendants misappropriated the fruits of

plaintiffs' labor by obtaining access to plaintiff's proprietary wood blocks through the abuse

of a confidential relationship.  Not only was there a misappropriation of the intangible

property, there was a misappropriation of the tangible wood hat blocks and samples.  As a

second element, defendant has acted unfairly.

104.    Eleventh, unjust enrichment.  Defendants benefited from having unrestricted and

unauthorized access to the wood blocks and samples representing decades of plaintiffs' best-

selling runners.  By converting these hat blocks and samples, defendants benefitted at

plaintiffs' expense.  It is against equity and good conscience to permit defendants to retain

the plaintiffs' property that is sought to be recovered.

105.    Ninth, intentional infliction of emotional distress.  The tort has four elements:  (1) extreme

and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of

causing, severe emotional distress; (3) a causal connection between the conduct and injury;

and (4) severe emotional distress. [33]

106.    Defendants' conduct has been malicious, extreme and outrageous, with intent to cause, or

disregard of a substantial probability of causing, severe emotional distress.  These are not just

---

[33] *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993).  See also *Lau v S&M Enters.*, 72 A.D.3d 497, 498
(1st Dep't 2010); *Margrabe v. Sexter & Warmflash, P.C.*, 353 Fed. Appx. 547, 550 (2d Cir. N.Y. 2009);
and *Biswas v. City of New York,* 12 Civ. 3607 (JGK), 2013 U.S. Dist. LEXIS 141029, at *75 (S.D.N.Y.
Sept. 30, 2013).

ordinary pieces of wood; these are an embodiment of the plaintiff's lifelong career of artistic design work. They are the embodiment of plaintiff's best-selling hat styles, and the means to plaintiff's economic livelihood. There is a causal connection between defendants' conversion and plaintiffs' injury. In addition to emotional distress, defendant's conversion of plaintiff's blocks has disrupted fifteen of her best-selling styles and has caused financial distress and disruption.

107.  Tenth, prima facie tort, the elements of which are: (1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful.[34]  In addition, there can be no recovery under this theory "unless malevolence is the sole motive for defendant's otherwise lawful act or, in [other words], unless defendant acts from disinterested malevolence."[35]

108.  Defendants have intentionally inflicted harm on the plaintiffs, which results in special damages, without any excuse or justification, by an act or series of acts, for example, the removal of the Shona, Tiffany and Madcap crown blocks from the pile of blocks on the floor after the police officer arrived. Malevolence is the sole motive.

## DEFENDANTS' REPLICATION OF PLAINTIFFS' WOODEN HAT BLOCKS

109.  On June 15, 2015, when co-plaintiff Tracey Tooker and her assistant Lisa McLellan visited defendants' studio to get the hat blocks back, plaintiff looked around defendants' hat making studio and noticed some of her hat blocks were still on the defendants' shelves.

---

[34] *Posner v. Lewis*, 18 N.Y.3d 566, 570 n.2 (2012).

[35] *Id.* [P]rima facie tort was designed to provide a remedy for intentional and malicious actions that cause harm and for which no traditional tort provides a remedy." *Kickertz v. New York University*, 110 A.D.3d 268, 277 (1st Dep't 2013).

110.   Several of plaintiff's hat blocks have a greenish tinge to them, from years of placing green

felt on them to make the hat size bigger.  Moreover, the appearance of an aged, darkened, 20

year old piece of wood is very different from a brand new bright yellow piece of wood.

Moreover, some of the darkened greenish pieces appeared as if attempts had been made to

sand them down.

111.   In several instances, co-plaintiff Tracey Tooker saw on defendants' studio shelves her own

proprietary wood block, and next to it a shiny brand new identical wood block.  This

indicates that Barbara Whitworth was having copies made of plaintiff's wood blocks.  During

the ten month period that defendants had plaintiff's wood blocks in hand, they could easily

go to a block maker and have them reproduced in wood.

112.   Plaintiff Tracey Tooker is of the belief that a hat block maker called Ramone Espinal is the

individual copying her wood blocks for Barbara Whitworth.  The only other wood hat block

maker in the U.S. is in Minnesota, and he makes them for plaintiff.  When Ms. Tooker called

Mr. Espinal and identified herself on the telephone, he immediately hung up.

113.   The causes of action from defendants' actions are as follows:

114.   First, breach of contract.  A contract existed between plaintiffs and defendants.  Defendants

were to make hats using plaintiffs' hat blocks and samples, at the request of, and for, the

plaintiffs.  Upon completion of the contract, defendants were to return plaintiffs' hat blocks

and samples.  Defendants were not authorized to make wood copies of plaintiff's wood

blocks.  Plaintiffs performed their duties under the contract, and defendants did not perform

under the contract, causing damages to plaintiffs.

115.   Second, breach of implied covenant of good faith and fair dealing.  Plaintiffs and defendants

were parties to a contract under which defendants were to make plaintiffs' hats to plaintiff's

specifications using plaintiffs' wood hat blocks and samples. By making wooden copies of said wood blocks for their own use, defendants deprived plaintiffs of the right to receive the benefits under the agreement. The implied covenant of good faith and fair dealing is wholly consistent with the contract.

116.   Third, breach of fiduciary duty. Between plaintiffs and their contract manufacturer, a fiduciary duty exists. Plaintiffs entrusted defendants with the possession of proprietary wood hat blocks embodying a lifelong career of plaintiff's best-selling, self-designed styles. Defendants' misconduct, including making wood copies of plaintiffs' hat blocks, constitute self-dealing, acting with a conflict of interest, and acting contrary to the interests of plaintiffs, causing injury and damages to plaintiffs.

117.   For co-defendant Chandra Ransamie, liability for aiding and abetting a breach of fiduciary duty. The party whom the defendant (i.e. Chandra Ransamie) aids (i.e. Barbara Whitworth) has performed a wrongful act that causes an injury, the defendant (Chandra Ransamie) was aware of her role as part of an overall illegal or tortious activity at the time she provided assistance, and Ms. Ransamie knowingly and substantially assisted the principal violation.

118.   Fourth, civil conspiracy. The co-defendants, Barbara Whitworth and Chandra Ransamie, and possibly Barbara Whitworth and Ramone Espinal, had an agreement amongst them, and intentionally participated in furtherance of a plan of converting and copying the wood blocks, resulting in damage to plaintiffs. In New York, a claim for conspiracy is the string whereby the plaintiffs may tie together those who, acting in concert, may be held responsible in damages for any overt act or acts.

119.   Fifth, unfair competition. The defendants misappropriated the fruits of plaintiffs' lifelong labor by obtaining access to plaintiff's design and marketing ideas, as embodied in the wood

36

hat blocks, through the abuse of a confidential relationship.  As a second element, defendant

has acted unfairly by unauthorized copying of plaintiffs' wood blocks.

120.   Sixth, common law copyright infringement of unregistered copyrights.  The custom made

and custom designed wooden hat blocks also incorporated the plaintiff's intangible property

into tangible property, as did the physical samples.  Defendants' copying of the plaintiff's

wood blocks into new wood blocks, which allows defendants to reproduce plaintiffs' designs

into the manufacture of defendant's own hats even in the event plaintiffs' hat blocks are

returned to plaintiffs, is an infringement of plaintiff's copyrights.  Defendants' conversion of

the plaintiffs' wood blocks and samples, allowing defendants to reproduce plaintiffs' designs

into the manufacture of defendant's own hats, is therefore an infringement of plaintiffs'

copyrights.

121.   Seventh, infringement of protected original designs of useful articles under Chapter 13 of the

federal Copyright Act, specifically 17 U.S.C. §1301(a)(1).  The useful article, is, in this instance,

the wooden hat block itself.  The plaintiff's original hat designs as embodied in her unique, made to

order wooden hat blocks made the hats more attractive and distinctive in appearance.  These were her

best-selling designs culled from decades of selling to the wealthy Palm Beach, Southampton and New

York City socialites and celebrities.  These wooden hat blocks are very useful to any hat maker who

has them in his/her possession.  The hat blocks had unique elements of style, shape, angle, height,

width, and/or slant that were independent of the utilitarian nature of the hat block, and it was those

unique design elements that made the hat blocks attractive and desirable.  During the infringement

period Defendants had sole physical access to the plaintiffs' wood blocks from which to make the hat

designs, and so the act of copying necessarily took place upon the defendant's use of the plaintiffs'

wood hat blocks to make replicas of the hat blocks.

122.   On June 15, 2015 the plaintiff saw with her own eyes, in defendants' studio, evidence that
       her wood blocks were being copied. She saw her old, dark greenish-tinged wood block and
       next to it, a shiny brand new wood reproduction. A wood block can be given to a hat block
       maker who can take exact measurements and make wood copies. Given the defendant's
       opportunity to copy the plaintiff's blocks by having access to them for many months in the
       capacity as a contractor and given exact similarities between the works, it is more likely than
       not, that the defendant used plaintiff's wood hat blocks to make exact reproductions of the
       plaintiff's wood blocks.

123.   Eighth, unjust enrichment. Defendants benefited from having unrestricted and unauthorized
       access to the wood hat blocks representing decades of plaintiffs' best-selling runners.
       Defendants were in no way authorized to make wooden copies of plaintiffs' valuable and
       proprietary wood hat blocks. Defendants benefitted at plaintiffs' expense. It is against
       equity and good conscience to permit the defendants to retain the wood reproductions that are
       sought to be recovered.

124.   Ninth, intentional infliction of emotional distress. Defendants' conduct has been malicious,
       extreme and outrageous, with intent to cause, or disregard of a substantial probability of
       causing, severe emotional distress. These are not just ordinary pieces of wood being copied.
       These represent not only an embodiment of the plaintiff's lifelong career of artistic design
       work, but also the means to plaintiff's economic livelihood. Defendant's making wood
       reproductions of plaintiff's wood hat blocks, representing years of plaintiffs' design work,
       has caused severe emotional distress. There is a causal connection between defendants' acts
       of conversion and plaintiffs' injury. In addition to emotional distress, defendant's conversion

of plaintiff's blocks has disrupted eleven of her twelve best-selling styles and has caused financial disruption, distress and confusion.

## RELIEFS SOUGHT

WHEREFORE, plaintiffs demand judgment against the defendants in the form of the following reliefs:

125.   Specific performance, consisting of the immediate return to plaintiffs of the missing hat molds (blocks) and samples; or alternatively, if defendants have lost, damaged, destroyed, sold, or abandoned the hat blocks or have otherwise deprived plaintiffs of their return, then a sum of money in the amount of the cost to reverse engineer, re-design and replace them.  In this respect, Plaintiffs annex an Exhibit detailing the replacement cost estimate of $2,400 from La Mode West Hat Blocks.  It should be noted that the replacement cost for the wood hats block is in no way indicative of the **value** of the blocks.  Because the wood blocks embody a valuable design, the value of the block is far greater than the cost of the wood molds themselves; similar to the way that the value of a proprietary designer dress pattern is far greater than the value of the mere oaktag patterns in which the designs are embodied, and the value of a unique architectural design is greater than the value of the mere paper that it is printed on.

126.   The immediate return to plaintiffs of the wood reproductions that defendants made of plaintiffs' wood blocks;

127.   Injunction against defendants, prohibiting them from manufacturing any more hats using plaintiffs' hat blocks, or samples, or reproductions of plaintiff's blocks;

128.    Arising from the conversion of the proprietary wood blocks and plaintiffs' loss of use of her

unique, best-selling designs for over ten months, compensatory damages of $60,000 for the

plaintiffs' loss of income from lost hat sales for the ten-month period from June 15, 2015

through February 15, 2016, and thereafter at $6,000 per month through the date of the return

of the hat blocks to plaintiffs;

129.    Compensatory damages of $4,504.50 for the cost of labor, raw materials, shipping costs, and

rework costs relating to the defective hats, including breach of implied warranty of

merchantability and implied warranty of fitness for a particular purpose;

130.    Compensatory damages of $10,000 for tortious interference with contractual relationships –

due to defendants' sloppy work and lateness in producing hats for high-profile customers,

plaintiffs suffered loss of credibility and loss of future business;

131.    Compensatory damages of $100,000 for breach of contract, breach of implied covenants of

good faith and fair dealing, breach of fiduciary duty, civil conspiracy, intentional inflection

of emotional distress, unjust enrichment, and prima facie tort, or any other remedy or

damages as the Court may allow;

132.    A disgorgement by defendants of all profits realized from defendants' sale of hat styles made

using plaintiffs' hat blocks.  Since the amount of profits is heretofore unknown, the plaintiffs

have estimated this to be $10,000;

133.    $10,000 in damages for unfair competition (both New York and Florida), being an estimate

of the amount of net income the defendants earned by using plaintiffs' hat blocks to

manufacture their own hats;

134.    Compensatory damages, estimated at $10,000, being the estimated net income of defendants,

for infringement of exclusive rights in a design under 17 U.S.C. §1309;

135.   Compensatory damages, estimated at $20,000, for infringement of trademarks and trade dress

under 15 U.S.C. §1125, including double damages and attorney's fees pursuant to 15 U.S.C.

§1117(a);

136.   Punitive damages of $800,000, or whatever amount the Court finds to be just and proper;

137.   Plus interest from June 15, 2015;

138.   Plus plaintiffs' attorney's fees, costs and disbursements, to the extent not covered above;

139.   Together with any other relief the Court finds to be just and proper.

Dated: 2/17/16

Theresa K. Dilworth, Esq.
*Attorney for Plaintiff TT Ltd., Inc.*

Theresa K. Dilworth, Esq.
3755 Hallock Lane Extension
P.O. Box 1185
Mattituck, N.Y. 11952
theresa.dilworth@mmc.com
631-5099-0117